IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| **NESTLÉ HEALTHCARE NUTRITION, INC., a Delaware corporation,** | |
| Plaintiff, | Case No. 19 C 8225 |
| v. | Judge Harry D. Leinenweber |
| **XCEL MED, LLC, an Illinois Limited Liability Company,** | |
| Defendant. | |

## MEMORANDUM OPINION AND ORDER

This is the second round of Cross-Motions for Summary Judgment the parties have filed. The first Motions were limited to what the parties referred to as "a question of law:" whether the purchase agreement imposed an obligation on Xcel to purchase medical nutritional products from Nestlé. (Dec. 1, 2020, Op. at 1, Dkt. No. 58.) The Court denied the Cross-Motions because the parties offered competing reasonable interpretations, the language did not unambiguously support either party's interpretation, and because certain extrinsic evidence would be considered.

The parties have now filed new Motions with their Rule 56.1 Statements of Material Facts in support of their interpretations.

## I. FACTUAL BACKGROUND

In March of 2019, Nestlé and Xcel entered into a contract for the sale of medical nutrition products. (Def.'s Resp. to Pl.'s Stmt. of Fact ("DSOF") ¶5, Dkt. No. 109; Purchase Agreement, Pl.s' Stmt. of Facts, Ex. 1, Dkt. No. 90-1.) The contract, which was to commence on April 1, 2019, was for a term of five (5) years and Nestlé agreed to sell Xcel its products at significantly reduced prices during the first two years of the agreement. (Purchase Agreement at 1.) In turn, Xcel promised to "commit to purchase a minimum of $6,500,000 and Ninety-five percent (95%) of Products each twelve month." (*Id.* at 1–2.) In addition, the contact provided a detailed monitoring system to make certain that Xcel was on track to meet its commitment. (*Id.* at 2.) Xcel could not terminate the contract during the first two years. (*Id.*) Thereafter, Xcel could terminate on ninety (90) days written notice. (*Id.*) Nestlé, on the other hand, could terminate the contract at any time if Xcel did not meet its purchase commitment. (*Id.*) In that event, Nestlé could also discontinue the price reductions. (*Id.*)

During pre-contract negotiations, the proposed agreement went through several iterations. (DSOF ¶ 18.) Nestlé was concerned that Xcel would use the reduced-price list to negotiate a better deal with its chief competitor, Abbott Nutrition. (*Id.* ¶ 17.) One of Nestlé's proposals was that Xcel could not terminate the agreement during the first year and would be required to pay a penalty fee

of 10% of the Annual Dollar Commitment for each month it failed to meet its purchase requirements. (*Id.* ¶ 18.) The purchase requirement for this iteration was $4.5 million. (Draft Purchase Agreement at 1, Pl.s' Stmt. of Facts, Ex. 21, Dkt. No. 90-9.) Xcel rejected the idea of a penalty fee. (DSOF ¶ 19.) Xcel also rejected a proposal that it receive rebates in lieu of reduced prices. (Pl.'s Resp. to Def.'s Stmt. of Facts ("PSOF") ¶ 5, Dkt. No. 108.) After lengthy negotiations the parties settled on language that included reduced prices and the purchase commitment of $6.5 million and 95% of its nutrition requirements. (*Id.* ¶ 18.)

Xcel contends that the $6,500,000 purchase commitment was clearly understood to be "aspirational" and not an actual commitment to make an annual purchase if that amount of product. (DSOF ¶ 22.) It pointed out that it had never purchased that amount of product in any year of its existence. (PSOF ¶¶ 28–30.) The parties dispute what was said about Xcel's ability to purchase such a large amount. (*Id.*) As indicated above, the initial drafts of the agreement put the purchase commitment at $4,500,000 which was raised to the higher amount in later drafts. (Draft Purchase Agreement at 1; DSOF ¶ 1.) During negotiations, Nestlé emailed Xcel asking if "you feel confident that you will be able to reach the $6.5 million in the current proposal." (DSOF ¶ 21.) According to Nestlé's negotiator, Xcel's negotiator gave him a verbal confirmation. (*Id.* ¶ 22.)

According to Xcel, when it contacted its customers to make the switch from Abbott to Nestlé products, it received "significant" push back from some of them. (PSOF ¶ 44). The record does not disclose the number that opposed. On June 5, 2019, just over two (2) months into the 5-year term of its agreement, Xcel sent a text message to Nestlé, stating "[w]e have decided not [to] move forward [with the purchase Agreement]. Sorry for the bad news." (Xcel text, Pl.s' Stmt. of Facts, Ex. 12, Dkt. No. 89-12). The very same day that it repudiated its agreement with Nestlé, Xcel executed an agreement with Abbott that contained similar terms and pricing. (DSOF ¶ 24.) While the pricing from Abbott was not disclosed to Nestlé in discovery, Xcel's President testified that the pricing was "very close" to the pricing in the purchase agreement with Nestlé. (*Id.* ¶ 27). The contract with Abbott was also for five (5) years and required Xcel to purchase "at least 90% of its needs of product" in the categories described in the contract. (*Id.* ¶ 29.)

Two days after receiving Xcel's rejection, Nestlé sent a letter to Xcel outlining its view of Xcel's breach and demanded it honor its commitment and, if it refused to do so, Nestlé would immediately proceed with litigation. (*Id.* ¶ 32). On June 12, 2019, Nestlé reiterated its position that Xcel was in violation of the contract and set forth the facts upon which it based this conclusion. (*Id.* ¶ 34). Nestlé also stated its intention to seek

its full legal remedies including recovery of all lost sales and profits resulting from Xcel's breach. (*Id.* ¶ 36). There is no evidence in the record to suggest that Xcel justified its refusal to honor its contract with Nestlé or that Xcel ever responded in writing to Nestlé's letters.

After the breach, pursuant to a provision in the Purchase Agreement, Nestlé raised its prices to Xcel. (PSOF ¶ 57). Finally, on October 10, 2019, Nestlé formally terminated the Purchase Agreement and informed Xcel that it would "pursue any and all remedies available to it at law or in equity. (*Id.* ¶ 44.) It then proceeded to file this lawsuit.

## II. **LEGAL STANDARD**

Summary judgment is appropriate if there is "no genuine dispute of material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). When analyzing cross motions for summary judgment, the ordinary standard for assessing each motion remains unchanged. *Blow v. Bijora*, 855 F.3d 793, 797 (7th Cir. 2017). A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party. *Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012). The relevant substantive law governs whether a fact is material. Id. When reviewing the record on a summary judgment motion, the Court must view the facts and draw reasonable inferences in the

light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007).

When a party who bears the burden of proof cannot establish the existence of an element essential to their case, summary judgment must be entered against them. *Berry v. Delta Airlines Inc.*, 260 F.3d 803, 808 (7th Cir. 2001.)

### III. <u>DISCUSSION</u>

The parties disagree on the interpretation of the contract. Nestlé argues that the facts show this is a straight-forward contract that is unambiguous, and which required Xcel to purchase $6.5 million worth of its products and at least 95% of is requirements in return for price concessions. Xcel did neither and therefore it is in violation of its contractual obligations. Xcel, on the other hand, argues that the phrase "must commit to purchase" is aspirational and did not constitute a binding commitment to purchase a specific dollar amount or percentage of its product needs. (Purchase Agreement at 1). Nestlé bolsters its argument by showing that the word "must" is "the clearest way to convey to an audience that they have to do something". Fed. Plain Language Guidelines, at 25 (2001) https://www.plainlanguage.gov/media/FederalPLGuidelines.pdf. Furthermore *Merriam-Webster* defines "commit" as obligating or pledging oneself. *Commit*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/commit (last visited November 17, 2022). It

defines "achieve" as "to carry out successfully." *Achieve*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/achieve (last visited November 17, 2022). On the other hand, Xcel states that the contract does not say "required to purchase" but merely "to commit to purchase," which it interprets as "aspirational." (Purchase Agreement at 1—2.)

The Court has previously ruled (in a vacuum) that the phrase was ambiguous, such that it was necessary to consider extrinsic evidence to determine which interpretation was the correct one. The parties have now filed their Rule 56.1 Statements of Fact and supporting documentation, in arguing how the Court or trier of fact should interpret the questioned phrase. Nestlé has shown the progression of the agreement over several iterations in which various procedures such as monetary penalties and rebates were contemplated to ensure compliance with the purchase requirements before the current version was agreed to. On the other hand, Xcel makes the point that it had never exceeded $4.5 million sales in any year, and it would have been crazy to bind itself to an iron clad commitment to purchase $6.5 million of product.

Even assuming that the phrase was in fact aspirational, however, does not let Xcel off the hook for breach of contract. Since "aspirational" does not appear to be a legal term of art (the word is not defined in *Black's Law Dictionary*), the Court needs to determine its common meaning. According to Merriam-

- 7 -

Webster, "aspirational" means relating to, or characterized by, aspiration. *Aspirational*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/aspirational (last visited November 17, 2022). "Aspiration" means a strong desire to achieve something high or great. *Aspiration*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/aspiration (last visited November 17, 2022). Since the Court has not found any case in Illinois or anywhere, where a court defined "aspirational," the term appears to be similar to the common contractual provision that requires a party use its "best efforts" to achieve a goal or commitment. While "best efforts" provisions are not rigorously enforced in Illinois, they will be enforced if the contract provides a standard for enforcement. *Gentieu v. Tony Stone Images/Chicago, Inc.*, 255 F.Supp.2d 838, 868 (N.D. Ill. 2003). However, under Illinois law, a best-efforts clause, even if it is express rather than implicit, may be used to aid the court in construction of ambiguous provisions. *Id.* at 869. Also, and more important, the covenant of good faith and fair dealing, which is implied in every contract in Illinois, can be a helpful guide in interpreting ambiguous terms. *Id.* at 870. Use of this covenant to enforce a best-efforts commitment goes back to Judge Cardozo's famous decision in *Wood v. Lucy, Lady Duff-Gordon*, 222 N.Y. 88 (1917) a case which most law students will recall.

In viewing the facts that are not controverted, the Court finds that Xcel is clearly in violation of its contractual obligations to Nestlé, whether we adopt Xcel's or Nestlé's interpretation of the contract. Assuming that the Court would interpret the contract as being aspirational, at a minimum Xcel would be required to use best efforts to achieve the sales goal. Clearly it did not. This case would meet the Illinois requirements for enforcing best effort clauses because the contract provides exacting performance standards, *i.e.,* the minimum $6.5 million and 95%. Further, the fact that just over 2 months into a five-year contract, Xcel text messaged to Nestlé that it was abandoning the contract is about as anticipatory a breach as anyone could conceive.

Xcel argues that if the Court finds that it breached the contract, Nestlé's remedy is confined to the two provisions specifically contained in the contract, *i.e.,* discontinue the discounts and/or termination. However, as Nestlé points out, Illinois law holds that the provision of specific remedies in the event of a breach without making them exclusive, does not prevent a party from pursuing any remedy which the law affords in addition to those provided in the contract. *Nitrin v. Bethlehem Steel Corp.*, 342 N.E. 2d 79, 86 (Ill. App. Ct. 1976). Here the contract does not limit the remedies so that Nestlé may pursue an action for breach of contract.

Accordingly, the court grants Nestlé's Motion for Summary Judgment and denies Xcel's Cross Motion for Summary Judgment.

## IV. DAMAGES

Under the Uniform Commercial Code, where a buyer repudiates a contract for the sale of goods, the seller is entitled to damages the profits he loses as a result of the repudiation. 810 ILCS 5/2-708. It is not necessary that the lost profits be proved with absolute certainty, rather the evidence must afford a reasonable basis for computation. *Royal's Reconditioning Corp, Inc. v. Royal*, 689 N.E.2d 237, 240 (Ill. App. Ct. 1997). Here Nestlé was assured of a ready customer for a two-year period. The discounted prices of the products to be sold to Xcel were guaranteed for that period. As the Court pointed out in its previous summary judgment ruling, the possible combination of products Xcel must purchase to meet the $6.5 million purchase requirement is finite and can be calculated from the appendix to the contract. Of course, all of Xcel's purchases from Nestlé during the two-year period will be deducted and the excess profit Nestlé earned as a result of raising prices after the repudiation will also be deducted. The result should be a reasonable approximation of the profits Nestlé lost as a result of the breach by Xcel. The parties are instructed to calculate the lost profits and submit their estimates to the Court.

## V. CONCLUSION

For the reasons stated herein, Nestlé's Motion for Summary Judgment (Dkt. No. 85) is granted. Xcel's Cross Motion for Summary Judgment (Dkt. No. 92) is denied. The parties are instructed to calculate the lost profits and submit their estimates to the Court within fourteen (14) days of the date of this Memorandum Opinion and Order.

**IT IS SO ORDERED.**

                                                Harry D. Leinenweber, Judge
                                                United States District Court

Dated: 12/7/2022